579 So.2d 1050 (1991)
STATE of Louisiana, Plaintiff-Appellee,
v.
Matt Conway LARSON, Defendant-Appellant.
No. Cr90-719.
Court of Appeal of Louisiana, Third Circuit.
April 17, 1991.
*1052 Ron Ware, Public Defender Office, Lake Charles, for defendant-appellant.
Elaine B. Solari, Asst. Dist. Atty., Lake Charles, for plaintiff-appellee.
Before DOMENGEAUX, C.J., and DOUCET and LABORDE, JJ.
*1053 DOUCET, Judge.
On November 17, 1988, Matt Conway Larson, defendant, was indicted by a grand jury for first degree murder, a violation of La.R.S. 14:30.
The victim in this case was Joshua Wayne Perry, who was born on April 29, 1987. Joshua was seventeen months old when he died. Angela Gail Baugard, Joshua's mother, testified that she had known defendant for approximately two years. Ms. Baugard first became aware that defendant was abusing Joshua when she came home one day and found bruises on the victim's buttocks and down one leg. Defendant had been baby-sitting Joshua and he admitted that he whipped the baby too hard.
A juvenile proceeding was held, and Joshua was found to be in need of care. Ms. Baugard was also told that defendant was not to be allowed to baby-sit Joshua.
On September 29, 1988, Ms. Baugard invited defendant to her residence which was located at 814 Fifth Street, Apt. B. Defendant arrived around 8:00 p.m. with a bottle of Evan Williams. Joshua was in his playpen about to go to sleep, when defendant arrived. Ms. Baugard testified that Joshua had a bath earlier that day and was clean and had a fresh diaper when she laid him down.
Ms. Baugard testified that she was in the mood to go out, but did not want to leave Joshua alone. Defendant volunteered to watch Joshua while she was gone. She was aware of the child protection order not to leave Joshua with defendant, but she did not think that defendant would intentionally hurt him. Before she left, she checked on Joshua, and he was sleeping in his playpen. She determined that he was breathing. Ms. Baugard went to several lounges and returned home at approximately 2:00 a.m. and found an ambulance pulling up in front of her house. She ran into the bedroom and saw Joshua on the bed completely nude and defendant sitting over him breathing in his nose. She noted that defendant was only wearing his underwear. While defendant was getting dressed, he told her something to the effect that the baby drowned. She observed a bruise on Joshua's left eye that was not there when she left to go out.
Joseph Swenson, who lives at 814½ Fifth Street, testified that on the morning of September 30, 1988, at about 2:00 a.m., defendant knocked on his door. When Mr. Swenson opened the door, defendant was wearing only his underwear and was attempting to perform CPR on a nude baby. Defendant told Mr. Swenson that he couldn't get a heartbeat. Defendant told him that he had left the baby in the bathtub. Mr. Swenson told his wife to call an ambulance. He went to make sure his wife called an ambulance and when he returned to the door, defendant was going down the stairs. About half-way down, defendant slipped and fell on the landing. Mr. Swenson did not know how the baby fell, but the end result was that the baby ended up laying next to defendant.
Brian Foti, an emergency medical technician for Holston Ambulance Service, testified that he was dispatched to Fifth Street in Lake Charles at approximately 2:20 a.m., for a possible pediatric drowning. Mr. Foti found Joshua in complete cardiac pulmonary arrest. He noticed that Joshua's skin color was very poor. Mr. Foti checked Joshua's pupils for pupillary response to light, and there was none. This indicated that brain death had already occurred. Mr. Foti stated that he believed the baby had been in cardiac arrest in excess of 15 to 20 minutes.
Michael Roberts, a paramedic supervisor at Holston Ambulance Service, testified that the baby appeared to be dry and did not look like he had been in the tub. He stated that when a tube was put down the baby's lungs to ventilate him, there were no sounds associated with water being in the lungs.
Randy Bellon, Chief of Detectives for the Lake Charles Police Department, testified that he arrived at the scene and entered the house. He looked at the bath tub and ran his hand inside of it and could not find any water. It was completely dry. However, the floor rug next to the bathtub was *1054 damp. Also, he did not see any wet clothes or wet towels in the bathroom.
Dr. Howard M. Riggs, III, an emergency room physician, examined Joshua upon his arrival at St. Patrick Hospital. He noticed that Joshua did not have any wrinkling of the palms or hands, or the soles of the feet, which people get when they are in water for more than 15 minutes. Also, there was no water in the lungs, which normally occurs in drownings. Dr. Riggs was accepted as an expert in the field of emergency medicine and he was of the opinion that Joshua did not drown. Dr. Riggs did notice a laceration over the right eye and bruising over the left eye.
Lt. Louis Hebert of the Lake Charles Police Department testified that defendant consented to taking a PEI test to determine the alcoholic content of his blood. The results of the test showed .074 grams percent alcohol concentration.
Lt. Hebert conducted several interviews with defendant, and Lt. Hebert stated:
"During the first interview, after asking Mr. Larson what happened, Mr. Larson stated that he had come over to the residence at about 6:00 or 6:30. This happened on the 29th. We were conducting the interviews later that morning on the 30th of September. Mr. Larson stated that he had come over to the apartment, referring to 5th Street, at about 6:00 or 6:30 that evening. He visited for a while with Ms. Baugard, and at about 9:00 o'clock p.m., she decided to go out for the evening. He stated that he was too tired to go out, that he would stay and babysit Joshua, the victim, which he referred to as Josh. Mr. Larson stated that not long after Ms. Baugard went out, he decided to start doing some housework, and he started cleaning the house. He stated that he began washing and drying clothes. He also stated that the infant was asleep in the bed. I'm not sure that the infant had gone to sleep, but he said he was sleeping in a bed. When I say "bed", referring to a playpen. This is not the large water bed, it's referring to a playpen area. At about midnight, he stated that the victim woke up crying. He then stated that he decided to give the baby a bath because the baby was dirty, and that his hair was greasy. He then fixed the water in the bathtub, in the photograph, and proceeded to give the baby a bath. He then remembered that he needed a towel."
Lt. Hebert continued relating what transpired during defendant's first interview.
Lt. Hebert further stated:
"He then stated that he needed a towel, so he went to the kitchen area to get the towel, then he rememberedto the kitchen area to get the towel from the dryer. He remembered that he had folded them and put them up, and he went back to the location. After he heard a noise coming from the bathroomwhen he heard the dryer buzzhe went back to that location in the bathroom is when he saw the victim facedown in the tub of water. He stated that he jerked the infant from the tub and then proceeded to do mouth-to-mouth. He then stated that after attempting to do mouth-to-mouth, he could not help him, that he went to get help."
Lt. Hebert conducted a second interview with defendant. During the second interview, defendant stated that while the baby was in the bathtub, he made two trips putting the trash outside. Defendant also stated during the second interview that he had been cooking chicken tenders in the oven on a cookie sheet, which began to burn. Defendant claimed to have removed the food from the oven and threw it in the trash. However, the police did not find any burned chicken in the trash.
Contrary to the testimony of Dr. Riggs, Lt. Hebert testified that while he was at the hospital where Joshua was being treated, he noticed that the child had wrinkled feet and his hair was damp.
Dr. Terry Welke, a physician and a forensic pathologist for Calcasieu Parish, performed the autopsy on the victim. He said, "My opinion of the cause of death was related to a craniocerebral injury, which means head and brain injuries."
On cross-examination, Dr. Welke was asked if he had received any information at the time of the autopsy, that after suffering *1055 a respiratory failure, the child was involved in a fall down a set of stairs. He said that he had not received the information at the time of the autopsy. Dr. Welke said that Mr. Ware, defense counsel, contacted him on January 24, 1989, and explained that defendant was carrying the child when he slipped down some stairs. Dr. Welke spoke with Lt. Hebert, who told him that he had spoken with Mr. Swenson, and Lt. Hebert said that it did not appear as though the infant struck anything during the fall.
Dr. Welke said that ten or twenty percent of drownings are dry drownings where the person has laryngospasm, a swelling of the Adam's apple, and he suffocates. They die because of lack of oxygen to the brain, and swelling of the brain is often due to lack of oxygen. However, his testimony indicated that other findings common to drowning victims were not present. While on cross-examination Dr. Welke was asked, "If a fall down the stairs had occurred after cessation of respiration, but before the cessation of a heartbeat, if blood were still circulating could these injuries have been sustained in a fall down the stairs?" Dr. Welke answered by saying that he had not seen the area where the fall occurred, therefore he could not answer. However, if he had viewed the area and took into consideration the bruising and the scrapes, then it would be possible that he could say that the injuries were a result of a fall down the stairs.
Dr. George M. McCormick, II, a defense witness, was accepted as an expert in the field of forensic and anatomic pathology. Dr. McCormick reviewed the autopsy report and examined microscopic slides and said that there were several causes of death that were not ruled out, including drowning. He went on to say that none of the wounds described in the autopsy report was sufficient to cause death. There was no causal connection to show that the surface wound caused the defect in the underlying organ, which caused death. Dr. McCormick was asked, "Would the wounds in and about the face and head be consistent with a child this age suffering a fall down a flight of stairs?" He said, "Yes." Defense counsel went on to ask, "If the child were not breathing at the time that he fell down the flight of stairs, would it still be possible for these wounds to have been made?" He said yes and stated:
"Because the heart would still be beating. The breathing itself is not necessary to produce the wounds that show hemorrhage, only a heartbeat is necessary. Postmortem wounds that are made after the heart quits beating don't force blood out into the tissues from the damaged blood vessels, it takes the beating heart."
Dr. McCormick examined EKG strips that were done on Joshua at the hospital and said that the EKG strips indicate that the heart was beating in a very slow rhythm, approaching death.
Dr. Welke, on rebuttal, said that the EKG strips showed electrical stimulus through the heart, not that the heart was actually beating. He also said that prolonged resuscitation would probably cause swelling of the brain.
After a trial by jury, the defendant was found guilty of manslaughter, a responsive verdict to first degree murder. He was sentenced to 17 years at hard labor. He appeals the sentence and conviction.

SUFFICIENCY OF THE EVIDENCE
The defendant urges that the evidence was not sufficient to sustain his conviction of manslaughter because it did not exclude every reasonable hypothesis of innocence.
In order for the State to obtain a conviction, it had to prove the essential elements of manslaughter beyond a reasonable doubt. La.R.S. 14:31 defines manslaughter as follows:
"(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds the offender's *1056 blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
(2) A homicide committed without any intent to cause death or great bodily harm."
The prosecution's case against the defendant consisted primarily of circumstantial evidence. This court in State v. Fruge, 445 So.2d 1293 (La.App. 3rd Cir.1984), writ denied, 447 So.2d 1072 (La.1984), appeal after remand, 470 So.2d 431 (La.App. 3rd Cir. 1985) enunciated the proper standard of appellate review in cases involving circumstantial evidence at page 1295 of that opinion as follows:
"The proper constitutional standard for appellate review of the sufficiency of the evidence to support a criminal conviction is that enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). For circumstantial evidence to convict, `it must exclude every reasonable hypothesis of innocence'. LSA-R.S. 15:438. The Jackson standard is applicable in cases involving both direct and circumstantial evidence. State v. Smith, 441 So.2d 739 (La.1983); State v. Sutton, 436 So.2d 471 (La.1983). According to Sutton:

'An appellate court reviewing the sufficiency of evidence must resolve any conflict in the direct evidence by viewing the evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime.'"
Further, it is the role of the factfinder to weigh the respective credibilities of the witnesses. Therefore, the appellate court should not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. See, State ex rel. Graffagnino, 436 So.2d 559 (La.1983); State v. Richardson, 425 So.2d 1228 (La. 1983).
After carefully reviewing all the evidence in this case in the manner prescribed in State v. Fruge, supra, we conclude that there was sufficient evidence, direct and circumstantial for the jury to find that the defendant was guilty beyond a reasonable doubt.

FAILURE TO REASSIGN CASE
The defendant next alleges that the trial court erred in denying his motion to compel the District Attorney to comply with due process requirements and to reassign the case. The defendant alleges that the system used to assign cases in Calcasieu Parish allows the prosecuting attorney to schedule cases in such a way as to allow the prosecution to choose the judge who will hear the case. This, the defendant states, is a violation of his right to due process under the Louisiana and United States Constitutions. He further argues that the method by which cases are assigned does not comply with the requirements of State v. Simpson, 551 So.2d 1303 (La.1989), that cases be assigned in such a way that the prosecutor cannot choose the judge.
In State v. Kimmel, 571 So.2d 208 (La. App. 3rd Cir.1990), this court also dealt with the method by which criminal cases are assigned in Calcasieu Parish. That method was in use at the time of the trial of this case as well. This court in Kimmel determined that the system being used did not meet the requirements of State v. Simpson, supra. However, the court determined that the defendant received a fair trial and that, as a result, the denial of his motion was harmless error stating that:
"La.C.Cr.P. art. 921 provides that `a judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused.' Therefore, a defendant's conviction will not be overturned, even when error is committed, if an appellate court finds beyond a reasonable doubt that the error was harmless in light of the total circumstances. State v. *1057 Humphrey, 412 So.2d 507 (La.1981). A reversal and a new trial is required only if there is a reasonable possibility that the error complained of may have contributed to the conviction. State v. Hocum, 456 So.2d 602 (La.1984). The defendant must show prejudice before his conviction will be reversed. State v. Sweeney, 443 So.2d 522 (La.1983)."
State v. Kimmel, supra, at p. 210.
In the case presently before us, the defendant did not seek the recusal of the judge. He does not allege bias or prejudice on the part of the trial judge. As in Kimmel, we find no evidence of bias or prejudice on the part of the trial court. Absent any evidence of prejudice and in light of the total circumstances of his conviction, we find that the court's failure to grant the motion to compel was harmless error.

SPANKING EVIDENCE
Defendant alleges that the trial court erred in admitting into evidence testimony regarding injuries to Joshua Perry allegedly caused by defendant spanking him.
The above issue was presented to this court in the form of a pre-trial writ. This court previously determined that the testimony regarding the injuries to the victim was admissible. See, State v. Matt Larson, an unpublished opinion bearing docket number K89-590 (La.App. 3rd Cir.1989), writ denied, 548 So.2d 1237 (La.1989). We will not reconsider this issue.

EVIDENCE OF JUVENILE PROCEEDING
Defendant alleges that the trial court erred in admitting into evidence testimony regarding an in need of care juvenile proceeding and its disposition.
The defense objected to the trial court allowing Ms. Baugard to testify concerning the entry of a judgment in the Fourteenth Judicial District Court, sitting in juvenile session, adjudicating Joshua to be a child in need of care. A portion of that judgment was that Joshua was not to be left alone with defendant.
The defense objected on the grounds of relevancy.
La.C.E. Art. 401 states:
"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
Defendant was on trial, charged with first degree murder, in connection with Joshua's death. The testimony was that Joshua had been previously determined to be in need of care and an order was issued by the juvenile court that defendant was not to baby-sit Joshua. When Joshua died, defendant was with him alone. It is beyond a doubt that the disposition of the juvenile court was relevant, since the defendant was charged with first degree murder in connection with the death of the victim of previous abuse by the defendant.
The defense further objected to the testimony based on hearsay.
La.C.E. Art. 801(C) states:
"Hearsay" is a statement, other than one made made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted.
Ms. Baugard testified as to the disposition of the juvenile proceeding. Although Ms. Baugard was present at the juvenile proceeding, her testimony as to the disposition of the proceeding would be hearsay. Ms. Baugard is testifying to what the declarant, the juvenile court, said in a previous proceeding. This is hearsay by definition, and was erroneously allowed into evidence. However, the defendant has failed to show that the error of allowing the hearsay evidence contributed to his conviction. As a result, we find that the error was harmless. See, State v. Kimmel, supra.

OPINION EVIDENCE
Defendant alleges the trial court erred in allowing Brian Foti to give an opinion as to the time of cardiac arrest.
The record does not reflect that Brian Foti was ever tendered or accepted as an *1058 expert witness. Brian Foti testified as a lay witness when he rendered his opinion as to how long Joshua had been in cardiac arrest.
La.C.E. Art. 701 states:
"If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are:
(1) Rationally based on the perception of the witness; and
(2) Helpful to a clear understanding of his testimony or the determination of a fact in issue."
Although Brian Foti was testifying as a lay witness, the State laid a proper foundation to show that Brian Foti had extensive training and personally dealt with this type of situation on numerous occasions.
Brian Foti testified that he was certified as a basic emergency medical technician and he had completed a paramedic class. He also testified that he had dealt with hundreds of life threatening cases and 50 to 60 cases similar to the one in this situation.
In State v. Brown, 550 So.2d 922 (La. App. 2nd Cir.1989), writ denied, 556 So.2d 1259 (La.1990), the court allowed a medical emergency technician to testify as to how old the needle marks were on the defendant's body. Defense counsel first asked about the needle marks on cross-examination and the State explored the subject on re-direct. However, defense counsel never objected to the witness testifying during trial.
On appeal, the court stated at p. 926 that:
"... the witness was obviously qualified as an expert, though not tendered as such. Even if he wasn't tendered as an expert, he was entitled, as a layman, to testify as to his observations following a physical examination of the defendant and the reasonable inferences from those circumstances."
In the case at hand, the State introduced the testimony and defense objected. However, the State laid a foundation as to the witness's training and experience. Even if he was not tendered as an expert, he was entitled, as a layman, to testify as to his observations following the examination of Joshua and to testify to the reasonable inferences from those observations.

EXPERT COMPENSATION
Defendant alleges the trial court erred in refusing to allow Dr. McCormick to testify as to the manner in which he was being compensated.
While on cross-examination by the State, Dr. McCormick was asked if he was testifying as a paid defense witness. He answered, "I am."
On re-direct examination defense counsel asked, "Dr. McCormick, to your knowledge, how are you being paid?" The court then called the attorneys to the bench and the State objected to the question. The court informed defense counsel that it would not permit the question. La.C.E. Art. 611(D) states that:
"A witness who has been cross-examined is subject to redirect examination as to matters covered on cross-examination and, in the discretion of the court, as to other matters in the case. When the court has allowed a party to bring out new matter on redirect, the other parties shall be provided an opportunity to recross on such matters."
Defense counsel argued that it was the State who brought up a new matter on cross-examination by its question regarding Dr. McCormick's compensation. Therefore, the defense argued that it should have the right to follow on re-direct what the prosecution brought in on cross-examination. However, while the court did not allow that particular question, Dr. McCormick did testify on re-direct that it makes no difference who pays him because he is not someone who can be bought. Dr. McCormick's testimony on re-direct that he was an impartial witness should be enough to negate any prejudicial effect from not allowing Dr. McCormick to testify as to how he was being paid.
Further, even if the judge did err, the defense has failed to show how this error *1059 contributed to defendant's conviction. Therefore, the error, if any, is harmless.

TREATISE EVIDENCE
The defendant alleges that the trial court erred in allowing the State, through the testimony of Dr. Welke, to introduce into evidence statements contained in learned treatises and medical journals.
La.C.E. Art. 803(18) states:
"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
* * * * * *
(18) Learned treatises. To the extent called to the attention of an expert witness upon cross-examination or, in a civil case, relied upon by him in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, such a statement may be read into evidence and received as an exhibit but may not be taken into the jury room."
Dr. Welke, a pathologist who testified for the State, said on re-direct examination that he had some literature to back the statements he had made. Dr. Welke referred to a book by title and author and gave a page number. He then proceeded to relate what was in the medical treatise. La.C.E. Art. 803(18) allows treatises to be used in cross-examination of an expert in a criminal case. La.C.E. Art. 803(18) does not allow an expert to use treatises during direct examination in a criminal case.
In the case at hand, the trial judge was in error in allowing Dr. Welke, an expert for the State, to refer to a treatise during re-direct examination. However, defense counsel's brief does not allege that there is a reasonable possibility that this error may have contributed to the defendant's conviction. Defense counsel also fails to allege how this reference to a treatise prejudiced defendant. Therefore, the error is harmless.

IMPROPER CLOSING ARGUMENTS
Defendant alleges that the trial court erred in denying defendant's motion for mistrial based on improper arguments. In brief, defense counsel points out ten instances where the State's closing argument was improper. After review we find these errors to be harmless.
First, the State emphasized twice that the charges in this case were brought by a grand jury and not by an assistant district attorney. However, defense counsel did not object when the State made these remarks.
In State v. Everett, 530 So.2d 615, 619 (La.App. 3rd Cir.1988), writ denied, 536 So.2d 1233 (La.1989), this court stated:
"At trial, the defendant's attorney did not voice any objections to the introduction of the contested evidence. A contemporaneous objection is required to preserve an error for appellate review. La.Code Crim.Proc. art. 841; State v. Kahey, 436 So.2d 475 (La.1983). Although the defendant did not object at the time of the introduction, we have reviewed the alleged errors, but find no merit in the defendant's arguments."
Since defense counsel did not object at trial, the error was not preserved for appellate review.
Next, the State said that Dr. Welke had explained that several learned treatises back up his opinion and Dr. McCormick did not. It has been determined that the court was in error in allowing Dr. Welke to refer to treatises on direct examination. However, it was determined that this was harmless error. While the trial judge erred again in allowing the State to refer to this in closing arguments, it would again be harmless error.
Further, in closing arguments, the State said:
"The issue in this case is not whether his neighbors or his friends might believe he's the kind of person who could have done something like that, the issue is whether he did. And we feel the evidence shows that he did. They might *1060 also tell you that he's not the kind of person who would abuse a child, but we've presented to you evidence that, in fact, he had abused Joshua on a prior occasion."
La.C.E. Art. 404 B(1) states:
"Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding."
According to La.C.E. Art. 404 B(1), the State's comment in closing arguments about defendant previously abusing the victim was improper. However, the State, during its case in chief, had already properly presented evidence to the jury about a previous incident where defendant abused the victim. Although the State's comment in closing arguments was improper, the prejudicial effect would be minimal since the jury had already been presented with evidence of this prior incident of abuse. State v. Kimmel, supra.
In closing arguments, the State referred to another case where an offender held a baby by its feet and slammed him against a wall.
La.C.Cr.P. Art. 774 states:
"The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice.
The state's rebuttal shall be confined to answering the argument of the defendant."
The State was trying to explain to the jury the definition of a dangerous weapon when reference was made to the facts of another case. Defense counsel objected and was overruled. The trial judge told the prosecutor to keep his comments to himself. Defense counsel did not ask the trial judge to admonish the jury. However, any prejudicial effect that the State's comment may have had was corrected by the judge when he cautioned the prosecutor to keep his comments to himself.
In the State's rebuttal, the prosecutor said that defense counsel alleging that the State failed to carry the burden of proof, is something that he has heard for eleven years. Defense counsel failed to allege how this statement prejudiced defendant.
The State said in closing that Dr. McCormick was a paid defense witness and defense counsel objected. The objection was sustained and the court told the prosecutor not to say anymore on the matter. While defense counsel failed to ask for an admonition, this improper argument was properly handled by the trial court.
The last allegations of improper argument brought out by defense counsel are not argued, no law is cited, and defense counsel fails to allege any prejudicial effect. These four allegations of improper closing arguments will not be considered because they are not briefed. State v. Thomas, 546 So.2d 343 (La.App. 3rd Cir. 1989), writ denied, 552 So.2d 379 (La.1989).

JURY INSTRUCTION
The defendant alleges that the trial court erred in instructing the jury that "you may infer that the defendant intended the natural and probable consequences of his acts." In brief, defense counsel abandons this assignment of error and therefore, it will not be considered.

EXCESSIVE SENTENCE
Finally, the defendant alleges that the sentence imposed was excessive.
Article 1, § 20 of the Louisiana Constitution of 1974, prohibits by law the imposition of excessive punishment. A sentence is excessive, in violation of Art. 1, § 20 of the Louisiana Constitution of 1974, *1061 if it is grossly disproportionate to the severity of the offense or nothing more than a needless infliction of pain and suffering. State v. Ratcliff, 416 So.2d 528 (La.1982); State v. Cassell, 540 So.2d 1219 (La.App. 3rd Cir.), writ denied, 548 So.2d 321 (La. 1989); State v. Moral, 541 So.2d 986 (La. App. 3rd Cir.1989). Even a sentence which falls within statutory limits mandated by the applicable statute may be excessive. State v. Sepulvado, 367 So.2d 762 (La. 1979). In order to constitute such a sentence, the penalty imposed must be so grossly disproportionate to the crime committed in light of the harm caused to society as to shock the court's sense of justice. State v. Cann, 471 So.2d 701 (La.1985); State v. Landry, 502 So.2d 281 (La.App. 3rd Cir.), writ denied, 508 So.2d 63 (La. 1987); State v. Celestine, 540 So.2d 1208 (La.App. 3rd Cir.1989). However, a trial judge is given wide discretion in imposing sentences within the statutory limits and a sentence should not be set aside as excessive absent a manifest abuse of that discretion. State v. Lanclos, 419 So.2d 475 (La. 1982); State v. Square, 433 So.2d 104 (La. 1983); State v. Roberts, 541 So.2d 961 (La. App. 2nd Cir.1989).
The sentencing judge must consider the sentencing guidelines of La.C.Cr.P. Art. 894.1 in imposing a sentence. State v. Sepulvado, supra. However, the sentencing judge need not articulate every aggravating and mitigating circumstance or read through a checklist of the items listed in order to comply with the requirements of Article 894.1. State v. Davis, 448 So.2d 645 (La.1984); State v. Vital, 491 So.2d 180 (La.App. 3rd Cir.1986).
Rather, the provisions of the statute are satisfied when the record affirmatively shows that the court considered the factors and stated for the record the considerations taken into account in imposing sentence. State v. Duncan, 420 So.2d 1105 (La.1982); State v. Dugas, 527 So.2d 610 (La.App. 3rd Cir.), writ denied, 533 So.2d 15 (La.1988).
Generally, in analyzing a sentence imposed for excessiveness, the reviewing court examines the sentence given to see where it falls with regard to the possible penalty which could have been imposed under the statute for the crime for which the defendant has been convicted and is being sentenced. Also, the record is scrutinized to determine whether there is an adequate factual basis supporting the sentence in light of the individual circumstances of the offense and character of the offender.
Defendant was convicted of manslaughter, a violation of La.R.S. 14:31, which carries a penalty of imprisonment at hard labor for not more than 21 years. Defendant's sentence of 17 years at hard labor is within the statutory limits. The law and jurisprudence involving the imposition of a sentence within statutory limits is well established and will not be reiterated herein. See, State v. Robicheaux, 412 So.2d 1313 (La.1982).
In sentencing, the court noted that defendant was a 35 year old divorced father of two. He has a high school education and one semester of college. He was last employed as a Cable T.V. repair person. It was also noted that defendant did not financially support his two children.
Defendant's prior criminal record, as noted by the court, consisted of criminal damage to property in 1974, no disposition available. Simple Burglary and Theft charges were dismissed in 1976. In 1985, defendant was sentenced to a five year suspended sentence for possession of cocaine. The judge also mentioned two incidents of abuse by defendant upon the victim.
The judge stated that defendant was not eligible for probation and he is in dire need of a custodial environment. A lesser sentence would deprecate the seriousness of his crime. The judge noted the age of the victim as 17 months.
While the trial judge did not enumerate each of the statutory guidelines, he adequately explained his reasons for imposing the sentence. The sentence imposed is not grossly disproportionate to the severity of this crime. It does not shock one's sense of justice. It is not excessive. The record provides an adequate factual basis for the sentence imposed. Accordingly, defendant's *1062 conviction and sentence are affirmed.
AFFIRMED.