JjMICHAEL E. KIRBY, Judge.

STATEMENT OF CASE

On January 31, 2002, Burnell Hart was indicted for the second degree murder of Coshia Turner.[1] At his arraignment on February 8 he pled not guilty. Trial began on January 21, 2003, and on January 23 a twelve-person jury found him guilty as charged. On July 18 Hart filed a motion for post verdict judgment of acquittal, and on October 2 he filed a motion for new trial. The court denied these motions. Hart then waived further delays, and the court sentenced him to life imprisonment without benefits of parole, probation, or suspension of sentence.

FACTS

On the morning of November 19, 2001 eleven-month-old Coshia Turner was taken to Touro Infirmary’s emergency room. Coshia had no signs of life, and her body was cold to the touch when she arrived. She was formally pronounced dead approximately forty minutes later. Dr. Kenneth Jordan, the emergency room physician who attended Coshia, testified Coshia had multiple bruises and abrasions Dover a good portion of her body, and these injuries were in various stages of healing. Dr. Jordan testified Coshia had bruises on her forehead, her cheek, and around her eyes, as well as on her back, her chest, and her abdomen. She also had thirty ccs of blood in her stomach, as well as bruising on her abdomen over her stomach, which he estimated was at least one day but less than two weeks old. Dr. Jordan, who was qualified as an expert in the field of emergency medicine and services, stated that incorrectly administering CPR would not have caused the bleeding in Coshia’s stomach; rather, it was caused by massive abdominal trauma that caused the tissue of the stomach to tear. Dr. Jordan also stated that normally a person’s body remains warm for an hour or two after death, and he theorized that the low temperature of Coshia’s body could be attributable either to her being dead for many hours or to her body being immersed in cold water for approximately an hour. He indicated someone told him that Coshia’s mother had immersed the baby in cold water that morning to try to revive her. Dr. Jordan testified a CT scan of Coshia’s brain showed swelling and bleeding, and he stated that this type of injury could not occur as a result of the child knocking her head against a wall. In addition, he stated that dropping a baby from chest height onto its head would not cause as much injury as was present in Coshia’s head. Dr. Jordan concluded that Coshia was the victim of non-accidental trauma.
*1239 The parties stipulated that if the forensic pathologist who performed the autopsy on Coshia were to testify, the testimony would be consistent with the findings in the autopsy protocol, which was introduced into evidence.
The protocol listed Coshia’s injuries, including: bruises on her forehead; abrasions on her left eyelid; brush bums on the left side of her face; a cut under her left eye; hemorrhaging in her eyes; sub-dural hemorrhaging over the left cerebral | ¡¡hemisphere, as well as at the base of the brain; cerebral swelling and hemorrhaging; at least eight bruises on her chest, mostly in the center of her chest, as well as abrasions; multiple bruises on her upper back; rib fractures and hemorrhages; blood in the peritoneal cavity and left lung; laceration in the liver; hemorrhaging in her stomach; abrasions on the left arm above the elbow and on her right upper arm and above her right knee; bruises on her right foot; scattered cuts on her left thigh; and bruises on the upper back of her arms and her buttocks. The protocol classified her death as homicide caused by child abuse.
Felicia Hart testified she is the defendant Burnell Hart’s sister. She stated that she first met Kimberly Turner, Coshia’s mother, a few weeks before Coshia’s death. Ms. Hart stated that during this two-week period, Kimberly lived with Burnell and his three children at Burnell’s house on Foucher Street, but neither of Kimberly’s two children resided with them. Ms. Hart testified that on the Thursday before Cos-hia’s death, she was visiting Burnell’s house when Kimberly received a call from Kimberly’s sister instructing Kimberly to pick up her children, who had been staying with Kimberly’s grandmother. Ms. Hart testified she accompanied Kimberly to her grandmother’s house, and when they picked up the children, Coshia and Kimberly, Jr. (who was two years old), the girls were dirty and had cuts on their faces. Ms. Hart stated that in addition, Coshia had a fever and was sick and crying, wanting Kimberly to hold her. Ms. Hart testified Kimberly refused to do so. Ms. Hart stated that when she asked Kimberly why Coshia was so sick, Kimberly refused to respond. Ms. Hart then suggested that they take Coshia to the hospital, and Kimberly replied that she did not want to do so because she was afraid she would go to jail. Ms. Hart stated she did not see either Kimberly or her brother hit Coshia that day.
|4Ms. Hart further testified that when she returned to the Foucher Street house on Sunday, the night before Coshia died, she noticed Coshia was lying on the couch, still sick and still crying. Ms. Hart noticed Coshia had more bruises than she had observed on Thursday. Ms. Hart stated Kimberly again rejected her advice to take Coshia to the hospital. Instead, Ms. Hart gave Coshia some medicine to help bring down Coshia’s fever. Ms. Hart stated she also saw Coshia hitting her head against the wall that evening. She maintained she did not see either Burnell or Kimberly strike the child that night, although she did see Kimberly drop Coshia to the ground, where Coshia fell onto her buttocks. Ms. Hart stated that the next day, Burnell came to her house to get an asthma machine, telling her that he wanted it because Coshia was not feeling well. Ms. Hart, however, could not find the machine.
Burnell Hart, Jr. testified he was six years old at the time of trial. After being found competent to testify, Burnell, Jr. stated he remembered Kimberly and her babies coming to stay at his house just before Coshia died. He stated that on the evening before Coshia died, Kimberly was in the kitchen and Coshia was in another *1240 room, crying for Kimberly. Burnell, Jr. stated that he saw his father punch Coshia hard in the chest four times and tell her not to go into the kitchen because Kimberly did not want her. Burnell, Jr. testified that Coshia cried for a time, and his older sister tried to feed her with a bottle. Cos-hia then went to sleep.
The young boy also testified that a man named John McDonald called for emergency services the next day for Coshia. Bur-nell, Jr. stated he was in the kitchen when the police arrived. Burnell, Jr.’s testimony was somewhat confused, however, because he testified that he had slept at his father’s house the night before trial, and that was the night he had seen his father hit Coshia. He also testified that |fiKimberly had three, not two, babies who came to the house. In addition, he first answered no, then yes, to the question of whether the last time he saw Coshia alive was the night before the police came to his house.
Blair Easton testified he was a N.O.P.D. fireman, assigned to a fire station near the defendant’s house. He testified that in cases where people seek emergency treatment, firefighters are also dispatched, and in many cases they respond before EMS personnel arrive.
Mr. Easton testified that on November 19, 2001 at approximately 8:00 a.m. he responded to the call of an unconscious child at the defendant’s house. He stated that when he arrived, he saw a woman sitting on a couch in the front room. In the second room, he saw the defendant standing next to a double bed, on top of which was a baby. The defendant was thrusting both of his hands into the baby’s chest, and he told Mr. Easton he had last seen the baby alive the night before. Mr. Easton stated that as he and his partner started setting up their equipment, he advised the defendant to use only one hand on the baby’s chest, but even this was too much pressure.
Mr. Easton testified that when he took the baby and placed her on the floor, she was already cold to the touch, her pupils were dilated, and she was not breathing. He testified he and his partner established an airway and started performing CPR. He stated the baby had large abrasions on her face and multiple bruising on her chest and neck. He testified that when his captain arrived, he advised his captain to secure the occupants of the house and notify the police. He continued to perform CPR on the baby until the ambulance arrived to take the baby to the hospital. Mr. Easton identified the woman sitting on the couch that morning [fias Kimberly Turner, whom he described as showing no emotion during the incident.
Det. Nicole McCaskill testified she responded to the call of an unconscious child at 1931 Foucher Street. She testified that by the time she arrived, EMS personnel and a fire engine were already on the scene. She testified that as she walked up to the house, EMTs were carrying out a baby. She testified she noticed the baby had several large bruises on her stomach and face. She described the baby as unresponsive and cold, and the baby’s eyes were rolled back into her head.
Det. McCaskill testified she called for a ranking officer, and upon subsequently receiving a call from the hospital, advising her to treat the matter as a homicide, she roped off the scene and separated Kimberly Turner and the defendant (the only adults in the house). She testified she advised them both of their rights, and she questioned Kimberly.
Det. McCaskill testified she found the defendant’s sons playing video games in the kitchen of the house. She later escorted the boys outside, where Ms. Hart was *1241 waiting for them. She testified she also helped dress Kimberly’s older daughter. Det. McCaskill testified that when she first arrived on the scene, the defendant seemed surprised to see her and told her that he had not called for the police.

DISCUSSION AND RECOMMENDATION

A. Errors Patent

A review of the record reveals no patent errors.

\rjB: Assignment of Error

By his sole assignment of error, the appellant argues the State presented insufficient evidence to support his conviction for second degree murder. Specifically, he argues that the evidence did not show that Coshia died as a direct result of his actions; at most, it showed she died while she was staying at his house. He insists the jury convicted him based upon his failure to take action to stop any further abuse or to seek medical attention for Cos-hia, a ground upon which the State did not charge him and had agreed not to present.
The test for determining the sufficiency of evidence to support a conviction was set forth in State v. Armstead, 2002-1030, pp. 5-6 (La.App. 4 Cir. 11/6/02), 832 So.2d 389, 393-394, writ den. 2002-3017 (La.4/21/03), 841 So.2d 791:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains
evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution but must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall, 523 So.2d 1305; Green, 588 So.2d 757. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319, 1324 (La.1992).
bln addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson, but rather is an evi-dentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
The appellant was charged with second degree murder, which provides in pertinent part: “Second degree murder is the killing of a human being: ... When the *1242 offender is engaged in the perpetration of cruelty to juveniles, even though he has no intent to kill or inflict great bodily harm.” La. R.S. 14:30.1 A(2)(b). Although the indictment merely charged the appellant with second degree murder the State’s answer to the bill of particulars, discovery, and inspection noted that particular subsection of the statute. Cruelty to juveniles is defined by La. R.S. 14:93 A as: “... the intentional or criminally negligent mistreatment or neglect, by anyone over the age of seventeen, of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child.” See State v. Keelen, 95-0668 (La.App. 4 Cir. 2/29/96), 670 So.2d 578. As noted by this court in State v. Leblanc, 2003-0276, p. 6 (La.App. 4 Cir. 11/19/03), 862 So.2d 129, 134, writ den. 2004-0054 (La.5/7/04), 872 So.2d 1078:
Specific criminal intent is “that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). The determination of specific criminal intent is a question of fact. State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, 373, cert. denied, Seals v. Louisiana, 520 U.S. 1199 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997). Specific intent may be inferred from the circumstances and the actions of the defendant. Seals, 684 So.2d at 373.
Here, the appellant does not argue that he was under the age of seventeen at the time Coshia died or that she was over that age. Indeed, there was ample evidence that Coshia was eleven months old at the time of her death, and the jury could observe the appellant to determine that he was over seventeen at the time of the death. Given the fact that his son testified he was six years old at the time of trial, it appears highly unlikely that the appellant was under seventeen at the time of Coshia’s death. In addition, the State adequately proved that Coshia was killed; the autopsy protocol classified her death as a homicide attributable to child abuse. The appellant argues, however, that the evidence does not support his conviction because there was no evidence of what injury caused her death. He maintains, therefore, that the jurors convicted him not because they believed he intentionally performed an act which led to her death, but rather because they found his failure to protect Coshia amounted to negligence, which the State had maintained it was not going to try to prove.
Contrary to the appellant’s argument, however, it appears the evidence more than adequately supported a finding that he intentionally mistreated Coshia, causing her unjustifiable pain or suffering. His son testified that he saw the appellant punch Coshia in the chest hard four times the night before her death when she kept crying for her mother, who was in another room and apparently did not want to see her. The ER physician who examined Coshia testified she had blood in her stomach and bruises on her chest which corresponded to her stomach area. The physician estimated these bruises were at least a day old. In addition, the autopsy protocol indicated Coshia had broken ribs. Although the defense |insought to explain these injuries occurred when the appellant attempted to revive Coshia using improper CPR techniques on the morning she was discovered not breathing, the ER physician testified that the type of injuries Cos-hia sustained would not have occurred through the use of improper CPR techniques. Rather, he indicated these injuries were the result of massive abdominal trauma which caused the tissues of her stomach to tear.
*1243 The appellant attacks his son’s credibility, especially with respect to his ability to judge when certain events occurred. Indeed, his son’s testimony was somewhat confused, and his perception of time was not clear. However, he was positive that he saw his father punch Coshia at night, not on the morning that she was taken to the hospital. As such, his observations could not be explained as merely seeing his father attempt to revive Coshia using CPR. In addition, the firefighter who responded to the call for assistance testified that when he entered the house, only the appellant and Coshia were in the bedroom where the appellant was trying to revive her. The officer who arrived as the EMTs were taking Coshia’s body out of the house testified both boys were in the kitchen playing video games when she arrived.
Even given Burnell, Jr.’s lack of clarity, the jury obviously believed his testimony that he saw the appellant punch Coshia in the stomach four times the night before she died. A factfinder’s credibility decision should not be disturbed unless it is clearly contrary to the evidence. State v. Huckabay, 2000-1082 (La.App. 4 Cir 2/6/02), 809 So.2d 1093, writ den. 2002-0703 (La.11/V02), 828 So.2d 564; State v. Harris, 99-3147 (La.App. 4 Cir. 5/31/00), 765 So.2d 432. The jury was able to observe the boy’s demeanor and judge his credibility, and his testimony as a whole is not so suspect that it was contrary to the evidence. Thus, Inthe State presented sufficient evidence to show the appellant violated La. R.S. 14:93 by intentionally mistreating Coshia, causing her unjustifiable pain or suffering.
The appellant insists, however, that the evidence was not sufficient to support his second degree murder conviction because there was no evidence as to the actual cause of death. Coshia already had many cuts and bruises when she arrived at the appellant’s house four days before she died. In addition, when Ms. Hart saw Coshia the day before she died, Coshia had more bruises and cuts than she had when Ms. Hart last saw her the day she arrived. The ER physician testified the bruises and cuts he observed on Coshia were of varying ages, indicating she had been injured over a period of time. In addition to the bleeding in her stomach, Coshia had cranial bleeding and brain swelling, also caused by significant trauma to her head. The only classification of death on the autopsy protocol was homicide by child abuse, but it did not specify exactly which injury, or combination of injuries, caused her death. The appellant was not the only person in the house with Coshia during the last days of her life.
In support, the appellant cites cases where defendants were convicted in connection with the death of a child and there was more evidence linking the defendant to the death than was presented here. In only one case, however, was the defendant charged with second degree murder, and in that case the State prosecuted the defendant under La. R.S. 14:301 A(l), where the offender had the intent to kill or inflict great bodily harm. In State v. Mosely, 475 So.2d 76 (La.App. 2 Cir.1985), the child sustained massive injuries while in the defendant’s care, including fingernail marks on both sides of the child’s neck and massive internal injuries. The jury convicted the defendant, and on review the court found hi>the evidence supported the verdict. Interestingly, in discussing the evidence adduced against the defendant, the court stated:
The Louisiana Supreme Court has held on several occasions that it is not essential that the act of the defendant should have been the sole cause of the death. If the conduct of defendant hastened the termination of life, or contributed, medi- *1244 ately or immediately to the death, in a degree sufficient to be a clearly contributing cause, that is sufficient cause in fact. State v. Matthews, 450 So.2d 644 (La.1984); State v. Wilson, 114 La. 398, 38 So. 397 (1905); State v. Scott, 12 La.Ann. 274 (1857). The Louisiana Supreme Court has adopted, in State v. Durio, 371 So.2d 1158 (La.1979), the standard for determining causation in fact that is approved by the LaFave and Scott treatise on criminal law. The standard is whether or not “the defendant’s conduct is a substantial factor in bringing about the forbidden result.” W. LaFave and A. Scott, Handbook on Criminal Law, § 35 at 250 (1972).
Mosely, 475 So.2d at 79.
In State v. Larson, 579 So.2d 1050 (La. App. 3 Cir.1991), the defendant was charged with manslaughter in the death of a child he was watching. The defendant claimed the baby drowned while he was bathing the child, but the autopsy showed no water in the child’s lungs; rather, the autopsy showed the baby died of head injuries. There was evidence the defendant fell on the stairs while holding the baby when he went to a neighbor’s apartment seeking help, but the neighbor testified it did not look like the child hit his head when the defendant fell. The defense presented an expert who theorized that none of the injuries listed in the autopsy would have caused the child’s death. Nonetheless the court upheld the defendant’s manslaughter conviction.
Two other cases cited by the appellant involved first degree murder convictions. In both State v. Deal, 2000-0434 (La.11/28/01), 802 So.2d 1254, cert. den. Deal v. Louisiana, 537 U.S. 828, 123 S.Ct. 124, 154 L.Ed.2d 42 (2002), and State v. Wright, 2001-0322 (La.12/4/02), 834 So.2d 974, cert. den. Wright v. Louisiana, 540 U.S. 833, 124 S.Ct. 82, 157 L.Ed.2d 62 (2003), the Court considered whether there was sufficient evidence to show the defendant intended to kill or inflict great bodily harm, elements the State was not required to show in the present case. In Deal, EMTs found pieces of wadded paper towels in the baby’s airways, and the defendant admitted “swabbing” the baby’s mouth with paper towels while trying to clean up the baby after it had spit up. The defendant also admitted throwing the baby into its crib when it continued to cry. The Court found that the considerable force needed to jam the pieces of paper towel into the baby’s airway and the force needed to inflict the head injuries showed an intent to kill or inflict great bodily harm.
Likewise, in Wright the defendant admitted he and the victim’s mother regularly beat the victim to “discipline” her. The autopsy listed the cause of death as child abuse, and the coroner testified that the child died of a massive head injury which could only have been caused by the infliction of significant force. The coroner testified: “Her cause of death is basically child abuse. The head injury is the final step in the blunt force injuries. The head and brain injury is what ultimately cause her death.” Wright, at p. 5, 834 So.2d at 980. The coroner testified that the continued abuse weakened the child’s immune system, but she would have survived absent the head trauma. The Court extensively discussed the principal theory of culpability and found the physical evidence, added to the defendant’s confessions, showed he had the specific intent to kill or inflict great bodily harm to the child, justifying the jury’s finding he was a principal to her murder.
| uHere, however, contrary to the appellant’s argument, the State did not have to prove he had the specific intent to kill Coshia or inflict great bodily harm upon *1245 her. Instead, it had to show her death occurred as a result of his intentional mistreatment of her which caused her unjustifiable pain or suffering. The evidence adduced at trial supports the jury’s finding that the beating the appellant administered contributed to Coshia’s death. While it is not clear that the beating alone would have killed Coshia, the beating in connection with her other injuries did kill her. The evidence shows that despite her other injuries, on the night before her death Coshia was still alert, crying, and ambulatory. It was only after the appellant beat her that she went to sleep, only to be discovered dead the next morning. Thus, there was sufficient evidence for the jury to find that the appellant’s actions resulted in her death, even though he may not have intended to kill her or inflict great bodily harm on her. Therefore, the State presented sufficient evidence to support his conviction for second degree murder which occurred as a result of a violation of La. R.S. 14:93.
In the alternative, the appellant argues that the jury was misled by the prosecutor’s argument into believing it could convict him of second degree murder upon a showing of his neglect in not preventing the injuries Coshia sustained while she was staying at his house and in not seeking medical attention for her. In support, he cites various times where the prosecutor argued to the jury that the appellant’s actions constituted negligence. He contends this argument caused the jury to convict him on the basis of criminal negligence under La. R.S. 14:93, |1fiwhich the State had agreed before trial was not applicable, rather than on the basis of intentional mistreatment.[2]
The appellant acknowledges that the court admonished the jury that it was not to consider neglect. During the closing argument, when the defense objected to the prosecutor’s reference to criminal neglect, the court explained it was going to let the prosecutor proceed, but it admonished the jury that it would instruct them on the law at the close of the case, noting: “I’ve discussed with the attorneys the instructions of law which I intend to give in this case is that there was an intentional mistreatment. There was no criminal neglect on the part of this defendant.” During its instructions on cruelty to juveniles, the court defined the crime only as the intentional mistreatment of the juvenile; it did not mention neglect. The court further stated: “Thus, in order to find that the defendant committed cruelty to juveniles, you must find first, that the defendant intentionally mistreated Coshia Turner by physically striking the victim, secondly, that the defendant was over the age of 17, and thirdly that the victim was under the age of 17, and that the defendant’s — fourthly, and that the defendant’s intentional mistreatment caused — caused the victim unjustifiable pain or suffering.” When the jury returned for further instructions, the court reiterated this instruction.
The court’s instructions clearly told the jurors that they must find the appellant intentionally mistreated Coshia in order to convict him of second degree murder. Although the appellant now argues that the court’s instruction was somewhat vague, defense counsel approved of this instruction prior to the court’s |1fireading it and *1246 did not object either time it was read. The instruction was not vague, and the court additionally told the jurors during the State’s argument that there was no negligence on the appellant’s part. Thus, the appellant has failed to show that any argument by the prosecutor concerning negligence on the appellant’s part influenced the jury’s verdict. As noted above, there was ample evidence for the jury to find the appellant intentionally mistreated Coshia, causing her unjustifiable pain or suffering. This claim has no merit, and the entire assignment of error has no merit.
For the above reasons the appellant’s conviction and sentence are affirmed.

AFFIRMED.

. The victim's mother, Kimberly Turner, was also indicted in the same bill for second degree murder. On March 12, 2002 the court found her incompetent to proceed. On November 13, 2003 the court found her unable to stand trial and ordered the case "closed” as to her. However, a lunacy hearing is set for December 9, 2004. She is not a party to this proceeding.

. Although we could find nothing in the record which specifically showed that the State planned to limit its proof to intentional mistreatment, at a pretrial hearing the judge stated: “In this case, based upon what you told me in chambers, the co-defendant [Kimberly Turner] is charged with the neglect, the defendant [Burnell Hart] is charged with committing the act itself. Correct?” The prosecutor replied affirmatively.